IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| ADRIAN TILEEKA GANT, ) | CIVIL ACTION NO. 9:14-3676-TMC-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.                                           ) | **REPORT AND RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein she was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI)[1] on December 21, 2011 (protective filing date), alleging disability beginning December 21, 2011, due to seizures, migraine headaches, thyroid disease, depression, insomnia, fainting spells, and irregular menstrual cycles. (See R.pp. 93, 254, 262, 301). Plaintiff's claims were denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law

---

[1]Although the definition of disability is the same under both DIB and SSI; Emberlin v. Astrue, No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who cannot establish that she was disabled during the insured period for DIB may still receive SSI benefits if she can establish that she is disabled and has limited means." Sienkiewicz v. Barnhart, No. 04-1542, 2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005); see also Splude v. Apfel, 165 F.3d 85, 87 (1st Cir. 1999)[Discussing the difference between DIB and SSI benefits].



Judge (ALJ), which was held on April 16, 2013. (R.pp. 107-121). The ALJ thereafter denied Plaintiff's claims in a decision issued May 7, 2013 (R.pp. 93-100).

On May 9, 2014, the Appeals Council granted Plaintiff's request for review of the ALJ's decision. (R.pp. 250-253). Plaintiff submitted additional information and arguments, and on August 7, 2014, the Appeals Council issued a decision finding that Plaintiff was not disabled as defined in the Social Security Act at any time from December 21, 2011 through May 7, 2013, the date of the ALJ's decision.

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct**



**a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## Medical Records

**Pre-disability date**. Plaintiff's medical record prior to her alleged disability onset date reflects that she has been having "spells" or seizures since approximately 2001. (R.p. 407). In June 2009, Plaintiff underwent a neurological consultation at the Medical University of South Carolina (MUSC) for complaints of migraine headaches and monthly spells. Plaintiff had an MRI and EEG performed, which were normal; a sleep study showed Plaintiff had bruxism (teeth grinding), but no seizures or obstructive apnea; while her neurologic examinations were unremarkable. (R.pp. 935-938). On January 15, 2010, Plaintiff complained of almost daily episodes in which she would "draw a blank," but denied loss of consciousness. It was unclear whether Plaintiff was having seizures or non-epileptic events. (R.pp. 930-933).

Plaintiff then underwent an epilepsy evaluation at MUSC in February 2010. Upon admission, Dr. Leonardo Bonilha noted that Plaintiff had never taken any anti-epileptic medication



consistently and that her seizures/spells were thus never well controlled. Neurologic examination was unremarkable, but she had stopped her medications, and video EEG captured two seizures while she was at the hospital. Dr. Bonilha diagnosed temporal lobe epilepsy (with bi-temporal origin) and started Plaintiff on Keppra along with Topamax. (R.pp. 913-914, see R.p. 420). Thereafter, in March 2010, Plaintiff reported no seizures and that she felt sharper. Dr. Bonilha opined that Plaintiff's seizure disorder was well-controlled on medication. (R.pp. 927-930).

In December 2010, Plaintiff was treated in the emergency room of East Cooper Medical Center for complaints of weakness and lightheadedness. She denied having a seizure, and stated she had not had one in about a month. (R.pp. 456-465). In February 2011, Plaintiff fell at work due to a syncope episode. She was treated at the emergency room, where it was noted she had no neurologic deficits. (R.pp. 429, 432-434, 440-443, 450-452). At a neurology follow up appointment at MUSC on May 13, 2011, Plaintiff complained that she was having seizures at night, but was unclear of the frequency. However, Plaintiff also admitted that she had stopped taking Topamax and often skipped her doses of Keppra. A neurologic examination was unremarkable, and a brain MRI was normal. Dr. Bonilha thought the seizures were likely due to Plaintiff's medication non-compliance, he adjusted Plaintiff's Keppra dosage, and discontinued her Topamax (because her headaches had stopped). (R.pp. 420-423). On June 10, 2011, Plaintiff was treated at the MUSC emergency room after she experienced a seizure, at which time a neurologic examination was unremarkable. (R.pp. 409-410).

On July 6, 2011, Plaintiff began treatment with Dr. Charles Kelly at Tidewater Neurology. She reported a ten-year history of a decreased level of consciousness that usually occurred at night, but said this had also occurred at work over the previous few months. Plaintiff



reported one to four episodes per month, with three episodes in June; complained that medication made her feel worse; and stated she felt better when she stopped medication or switched to another drug. A neurologic examination was unremarkable, and Dr. Kelly assessed Plaintiff with a seizure disorder. He indicated he was going to obtain Plaintiff's records including previous test results, and planned a repeat MRI and ambulatory EEG. (R.pp. 469-471). On July 27, 2011, Dr. Kelly noted that Plaintiff's EEG showed some bilateral temporal sharp waves and temporal discharges consistent with a complex partial seizure disorder, although the relationship between this condition and Plaintiff's headaches was unclear. Dr. Kelly noted that Plaintiff was doing much better on Topamax (a seizure and migraine medication) and added Depakote MR. (R.p. 472).

On August 24, 2011, Plaintiff reported she was doing "very well" on Depakote and had had no more spells since starting the medication. (R.p. 475). She again reported doing well on Depakote (with only a slight increase in her headaches) without seizures on September 14, 2011. Dr. Kelly increased Plaintiff's dosage of Depakote, decreased her Keppra, and prescribed Lunesta for refractory insomnia. (R.p. 477). Plaintiff stopped by Tidewater Neurology on September 27, 2011, and reported that she had had a seizure about a week before and still did not feel right. Her Depakote dosage was increased. (R.p. 972). On October 5, 2011, it was noted that Plaintiff had had a breakthrough seizure. It was also noted that although she was still on a lower dose of Depakote at that time, that even with an increase in the dosage, her Depakote level was "still barely therapeutic." The plan was to increase her Depakote dosage and for Plaintiff to seek emergency medical care for any recurrent seizures. (R.p. 479).

In November 2011, Plaintiff was doing well on Depakote from a seizure standpoint, but she reported significant weight gain and wanted to try a different medication. Dr. Kelly instructed

5



Plaintiff to taper Depakote and begin taking Vimpat. (R.p. 390). On December 7, 2011, Plaintiff reported that she had only had one breakthrough seizure since beginning Vimpat, but complained of increasing problems with depression. She denied any weakness. Dr. Kelly prescribed Effexor and increased Vimpat, noting that many seizure medications can cause worsening of depression and many depression medicines can cause an decrease in the seizure threshold. (R.pp. 483-484). Plaintiff was treated in the emergency room for a migraine headache on December 8, 2011. (R.pp. 444-446).

Notwithstanding this history of seizures and medical treatment for her condition, Plaintiff does not herself contend that her condition was disabling during this time period. Therefore, in order to obtain DIB, Plaintiff must show that her condition significantly worsened from what it was during this period of time in order to obtain disability benefits. Cf. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) [absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability].

**Post-disability date**. On December 19, 2011 (two (2) days before Plaintiff's alleged onset of disability date), Plaintiff sought treatment in the emergency room after she experienced a near-syncope episode at work and almost passed out. A neurological examination at that time was negative, and she was released to her home. (R.pp. 437-439, 447-449). The following month (on January 4, 2012), Plaintiff reported to Dr. Kelly that she continued to have breakthrough seizures and depression. Dr. Kelly noted that Plaintiff's seizures had increased on Effexor, so it was discontinued. Plaintiff was also referred to Charleston County Mental Health for help with her depression. (R.p. 485). On February 15, 2012, Plaintiff reported her depression had improved, although she had not gone to the mental health center and did not want to go. Dr. Kelly prescribed Celexa. (R.pp. 513-514).



Dr. E. G. Schleimer, a psychologist, evaluated Plaintiff on March 7, 2012. Plaintiff's reported activities included going out to lunch with friends, shopping, "hanging out" with her aunt, watching television, and doing some housework. Bender Gestalt testing suggested that Plaintiff had some visual acuity problems with apparent confusion about directions or relationships among objects in the visual field. Reading testing results were at grade 6.9, which was considered remarkably low given Plaintiff's history of education and experience teaching others reading, and was thought to possibly represent a relatively new loss in word-recognition. Otherwise, Dr. Schleimer found no obvious abnormalities of behavior, intact memory, quite good attention and concentration for verbal tasks, and speedily performed serial threes. Dr. Schleimer assessed depression (NOS, severe, associated with medical problems) and assigned Plaintiff a GAF[2] of 50. (R.pp. 490-491).

On March 21, 2012, state agency physician Dr. Isabell McCall opined that Plaintiff had the RFC to perform work at all exertional levels with postural limitations of avoiding hazzards and climbing of ladders, ropes, and scaffolds due to her seizures. (R.pp. 134-136, 146-148).

On March 28, 2012, Plaintiff reported she had had only one seizure since her previous visit with Dr. Kelly. Plaintiff did complain that she had difficulty keeping her mind quiet and had some nervousness and tremulousness on her medication, which Dr. Kelly thought represented some anxiety and obsessive-compulsive issues. Dr. Kelly continued Plaintiff's medication, with an increase in her Celexa dosage. (R.pp. 515-516). Records reflect that on April 3, 2012, Plaintiff called Tidewater Neurology and asked if she could take two Vimpat together instead of spacing them out

---

[2]"Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 597 n.1 (9th Cir. 1999). A GAF score between 41 to 50 indicates "serious symptoms" or "serious difficulty in social or occupational functioning". Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).



because she had had a seizure the night before and felt weak. (R.p. 965).    Plaintiff reported increasing anxiety to Dr. Kelly on April 25, 2012, but it was also noted that she had never increased her dosage of Celexa. Plaintiff described one breakthrough seizure since her previous visit with Dr. Kelly, and Dr. Kelly increased Plaintiff's Celexa dosage and prescribed Klonopin for anxiety and sleep. (R.pp. 517-518). Plaintiff telephoned Tidewater Neurology to report a seizure on May 17, 2012. (R.p. 964).

On June 7, 2012, state agency psychologist Dr. Olin Hamrick, Jr. opined after a review of Plaintiff's medical records that Plaintiff was moderately limited in her ability to carry out detailed instructions, but was capable of performing simple tasks for at least two-hour periods of time. (R.pp. 164-166, 177-179). On June 8, 2012, state agency physician Dr. Jim Liao opined that Plaintiff had the RFC (Residual Functional Capacity) to perform work at all exertional levels, with postural limitations that she avoid hazards (e.g., machinery, heights, etc.) and not climb ladders, ropes, and scaffolds. (R.pp. 163-164, 177-178).

On June 20, 2012, Plaintiff reported that she continued to have some breakthrough seizures. Dr. Kelly added Keppra because review of her medical records indicated she had done well on this medication in the past. (R.pp. 641-643).

On July 12, 2012, Dr. Kelly completed a "Seizures Residual Functional Capacity Questionnaire" at Plaintiff's request. He wrote that he had known Plaintiff since July 6, 2011; he saw her about every month; she was diagnosed with complex partial seizure with refractory epilepsy; her seizures occurred without warning and were generalized (not localized) with loss of consciousness; with her seizures typically lasting five minutes and not occurring at any particular time of day. Dr. Kelly estimated that Plaintiff had seizures, on average, two to three times a week, with her most

8



recent ones being on June 17, June 18, and June 20, 2012. Stress was noted to be a precipitating factor, with post-ictal manifestations including confusion lasting ten to fifteen minutes. While Plaintiff did not have a history of injury during a seizure, she did report a history of fecal or urinary incontinence during a seizure. Dr. Kelly opined that Plaintiff's seizures also resulted in associated depression, and interfered moderately with her daily activities following a seizure. Additionally, Plaintiff experienced lethargy from her medications (which included Vimpat and Keppra). Dr. Kelly opined that Plaintiff's seizures were likely to disrupt her coworkers, that she would need more supervision than an impaired worker, that she could not work at heights or around power machines that required an alert operator, and that while she could ride a bus alone, she could not operate a motor vehicle. He did not think Plaintiff had any restrictions on standing, walking, sitting, or lifting; believed she was capable of performing low-stress jobs; and would infrequently need to take unscheduled breaks during an eight-hour workday. Dr. Kelly estimated that Plaintiff would miss five or more days per month as a result of her impairments or treatment, and that she was "disabled" as of June 20, 2012. (R.pp. 612-616).

On July 18, 2012, Plaintiff called Tidewater Neurology to inform Dr. Kelly that she had had a seizure early that morning as well as the previous Wednesday, and had not yet received the Keppra he prescribed. (R.p. 960). On August 1, 2012, Plaintiff reported that most of her symptoms occurred at bedtime, but she had also had some daytime seizures. A neurologic examination was unremarkable. Dr. Kelly noted that it was hard for Plaintiff to get good control over her symptoms, that she had run out of Vimpat two days previously, and had only been taking Keppra for a few days. Dr. Kelly increased Plaintiff's Vimpat dosage. (R.p. 644-646). At Plaintiff's next examination on August 29, 2012, Dr. Kelly provided a short review of her "complicated" medical history. He noted



that after adding Depakote to Plaintiff's medications she had had excellent results and was seizure free for some time, that her dosage had been increased and she had no breakthrough seizures but had other problems including weight gain, and that he had changed her medication to Vimpat and she had had no breakthrough seizures but complained of increasing depression and anxiety that might be related to taking Keppra. A neurologic examination was unremarkable. Plaintiff was referred again to Charleston County Mental Health because of her refractory depression. Keppra was discontinued, and Topamax was added. (R.pp. 647-649).

In October 2012, approximately five months after the ALJ's decision, Karen Mitchell-Oliver, M.A. conducted an initial clinical assessment of Plaintiff at the Charleston County Mental Health Center. A mental status examination was unremarkable except for racing speech. Plaintiff was diagnosed with major depressive disorder and her GAF was assessed at 65.[3] (R.pp. 683-387).

On October 3, 2012, Plaintiff reported to Dr. Kelly that she had had two seizures (on September 2 and 16, 2012). She complained of memory issues (for the previous ten years with an increase in the previous two years) and difficulty focusing. Plaintiff's Topamax dosage was increased. (R.pp. 955-956). She thereafter continued to contact Tidewater Neurology for medication refills, and did not report any breakthrough seizures during her contacts with the office in December 2012 (although she complained that she had woken up with her lips swollen and the inside of her mouth "all bit up" a few times a month in the previous three months), and none in January, February, July, and August 2013. (R.pp. 949-954).

---

[3] A GAF score of 61-70 indicates that only some mild symptoms of depression or difficulty in social or occupational settings are present. Simons v. Barnhart, No. 04-5021, 2004 WL 2633448, at **2 (4th Cir. Nov. 18, 2004).



**Discussion**

Plaintiff was twenty-seven years old at the time of the ALJ's decision, and has a high school education. (R.pp. 7, 302). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevent her from engaging in all substantial gainful activity for which she is qualified by her age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months.

After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[4] of a seizure disorder and depression (R.p. 95), she nevertheless retained the residual functional capacity for a full range of work at all exertional levels except that she cannot climb ladders, ropes, and scaffolds; must avoid all hazards; and is limited to simple, routine, and repetitive tasks in a low-stress environment with no rigid quotas or fast-paced production. (R.p. 97). At step four, the ALJ found that Plaintiff was capable of performing her past relevant work as a cashier with these limitations, and was therefore not disabled during the period at issue. (R.pp. 99-100). On appeal, the Appeals Council adopted the ALJ's findings, except as to the ALJ's finding at step 4 that Plaintiff could return to her past relevant work as a cashier. Even so, the Appeals Council found, based on the testimony of the Vocational Expert (VE) at the hearing before the ALJ, that Plaintiff could perform other jobs existing in significant numbers in the national economy, and was therefore not disabled during the period at issue. (R.pp. 4-7).

---

[4]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

11



Plaintiff asserts that in reaching this decision, both the ALJ and the Appeals Council failed to give proper weight to the opinion of her treating physician (Dr. Kelly), that the Appeals Council erred by failing to give an explanation for its adoption of the ALJ's decision and by failing to explain the weight it gave to the additional evidence it received (including the lay witness statements), and that the Appeals Council erred in ignoring the findings of the State Agency in regards to Plaintiff's Medicaid eligibility. After careful review and consideration of the arguments presented, for the reasons set forth hereinbelow the undersigned is constrained to agree with the Plaintiff that the Appeals Council erred by failing to evaluate and explain the weight it gave the additional evidence received, thereby requiring reversal of the decision with remand.

After the Appeals Council notified Plaintiff of its intent to grant review of the ALJ's decision, Plaintiff submitted additional records. The Appeals Council noted in its decision that many of these medical records were from a time after the ALJ's decision and did not affect the decision of whether Plaintiff was disabled beginning on or before May 7, 2013.[5] (R.p. 4). See Jones v. Callahan,

---

[5]Plaintiff does not appear to challenge the Appeals Council's decision to not include this evidence in the record, except perhaps as to the award of Medicaid benefits to Plaintiff. However, in the Medicaid determination, Plaintiff had an onset date of August 1, 2013, approximately three months after the ALJ's decision. The Appeals Council specifically stated that the new information, which included the records from the South Carolina Department of Health and Human Services (this includes the Medicaid determination - see R.pp. 11-23, 41-67) was about a later time and did not affect the decision about whether Plaintiff was disabled beginning on or before May 7, 2013. (R.p. 4). Further, there is no indication that the Medicaid award of benefits (Plaintiff applied for Medicaid benefits in October 2013) was retroactive to the time period at issue in this case, as the Medicaid approval letter itself provides that Plaintiff's Medicaid card was effective on October 1, 2013, and provided retroactive dates of August 1 and September 1, 2013. (R.p. 12). Further, the Department of Health and Human Services advised that it could not adopt the ALJ's decision because Plaintiff reported *new* allegations involving pain in her breasts, shoulder, hands, fingers, and feet as well as problems involving her vision, menstrual cycle, stomach, and neck. (R.p. 17). Plaintiff also has made no argument that she met or equaled the Listing of Impairments at § 11 (Neurological -which includes epilepsy), which was the reason given for the Medicaid disability determination (with an
(continued...)



122 F.3d 1148, 1154 (8th Cir. 1997)["Additional evidence showing a deterioration in a claimant's condition significantly after the date of the Commissioner's final decision is not a material basis for remand, although it may be grounds for a new application of benefits."].  However, the Appeals Council admitted some other medical records (from March 2009 through August 2013) as well as statements from lay witnesses (R.pp. 4, 8-9) into the record, but did not specifically address this evidence.  Plaintiff argues, based on the Fourth Circuit's decision in Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2012), that the Appeals Council "was required to articulate its reasoning (for finding Plaintiff not to be disabled) because it issued its own decision." Plaintiff's Reply Brief, at 1-2.  The Commissioner argues that the new evidence should not change the ALJ's decision to discount Dr. Kelly's opinion of disability, that Plaintiff cites no legal authority supporting her assertion that the Appeals Council was required to explicitly address its analysis of the new evidence, and that crediting the lay witness statements would not have affected the Commissioner's decision.  However, the Fourth Circuit noted in Meyer that, while the Social Security regulations do not require the Appeals Council to articulate its rationale when it denies a request for review, "if the Appeals Council grants a request for review and issues its own decision on the merits [ ] the Appeals Council [is] required to make findings of fact and explain its reasoning."  Meyer v. Astrue, 662 F.3d at 705-706.  The Appeals Council failed to do so in this case.

In its decision, the Appeals Council stated that the new evidence (as noted on the supplemental list of exhibits) had been "received and considered", and that it had considered the "entire record" in making its findings.  (R.pp. 4, 6).  However, the Appeals Council does not support

---

⁵(...continued)
onset date of August 1, 2013, *after* the ALJ's decision).  (R.p. 15).

13



this conclusory statement with any actual findings or analysis at the first three steps of the sequential evaluation process in light of the additional evidence submitted.

As noted above, Plaintiff submitted an opinion from her treating neurologist (Dr. Kelly) in which he, inter alia, estimated that Plaintiff would miss five or more days per month as a result of her impairments or treatment and was disabled as of June 20, 2012. (R.pp. 616). A treating physician's opinion is ordinarily entitled to great weight; Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996)[Noting importance of treating physician opinion]; is entitled to deference, and must be weighed using all of the factors provided for in 20 C.F.R. §§ 404.1527 and 416.927. See SSR 96-2p. Under these regulations, a treating source's opinion on the nature and severity of an impairment is entitled to "controlling weight" where it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. Further, the ALJ is required to provide an explanation in the decision for what weight is given a treating source's opinion and, if rejected, why it was rejected. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). The ALJ accorded "little weight" to Dr. Kelly's opinion that Plaintiff would likely miss more than five days of work per month, finding that this opinion was inconsistent with Dr. Kelly's treatment notes indicating that Plaintiff has good control of her seizures with medications. The ALJ also discounted the opinion because it was "unsupported by the weight of the evidence of record." (R.p. 99).

The Appeals Council adopted the ALJ's findings at steps one, two, and three, but in doing so failed to discuss the new evidence of record, in particular the additional evidence from Plaintiff's treating physician, Dr. Kelly. (R.pp. 948-977). Concededly, where the Appeals Council has before it the same record that was before the ALJ, it does not necessarily need to independently

14



explain its consideration of the medical evidence, even in a case (such as we have here) where it has granted a request for review. See, e.g., Satornino v. Commissioner of Social Sec., No. 12–1059, 2013 WL 1798955 (M.D.Fla. Apr. 10, 2013)["[A]lthough the Appeals Council did not independently state the weight given to the medical opinions of record, because it adopted the ALJ's findings as to evidentiary facts and the RFC, wherein the ALJ stated the weight given to the medical opinions, the Appeals Council complied with 20 CFR § 404.1527(e)(3)."].  However, in this case new evidence was submitted to the Appeals Council, which was accepted by the Appeals Council and included in the record.  This new evidence includes substantial additional medical evidence that was not before the ALJ for review, including more treatment notes from Dr. Kelly.  These records indicate that Plaintiff continued to have breakthrough seizures on October 3, 2012, had to change medications because of side effects on a number of occasions, and had problems with her breakthrough seizures (R.pp. 955-956).  These records also show that Plaintiff contacted Dr. Kelly's office concerning possible breakthrough seizures in September 2011, and in April, May, July, and December 2012. (R.pp. 954, 960, 964, 965, 972, 974).

Although it may be that the Appeals Council fully considered this new evidence and came to the same conclusion as the ALJ, the fact remains that its reasons for doing so are not set forth in its decision.  This is clear error.  Meyer, 662 F.3d at 705-706 [Finding that when the Appeals Council grants a request for review and issues its own decision on the merits, it must follow the same rules for considering opinion evidence as ALJ's follow, and is required to make findings of fact and explain its reasoning]; cf. Morales v. Apfel, 225 F.3d 310, 317-318 (3d Cir. 2000) [ALJ must explicitly weigh the evidence and explain his rejection of the medical opinion of a treating physician]; Cotter v. Harris, 642 F.2d 700 (3rd Cir. 1981) [listing cases remanded because of failure to provide



explanation or reason for rejecting or not addressing relevant probative evidence]; Wheelock v. Astrue, No. 07-3786, 2009 WL 250031, at * 8 (D.S.C. Feb. 3, 2009)[Remanding case to obtain assessment of new and material evidence presented by Plaintiff to the Appeals Council where Appeals Council did not specify a reason for rejecting it or explicitly indicating the weight given to that evidence]; see also, Rudd v. Commissioner, No. 14-3125, 2015 WL 4660682, * 13 (D.S.C. Aug. 5, 2015) [same]; Byars v. Colvin, No. 14-3694, 2015 WL 4423342, * 21-22 (D.S.C. July 17, 2015) [same].

The Appeals Council also erred by failing to properly consider the lay witness statements, which Plaintiff claims "directly contradict the ALJ's findings regarding [Plaintiff's] ability to function as well as her credibility." Plaintiff's Brief, ECF No. 13 at 38. Plaintiff argues that the RFC assessment must be based on all evidence of record, including lay evidence; see SSR 96-8p ["The RFC assessment must be based on *all* of the relevant evidence in the case record, such as: .... Lay evidence..."]; and that "other sources" (which include family and friends) are to be considered in evaluating credibility. See SSR 96-7p ("Other sources [which includes family and friends] may provide information from which inferences and conclusions may be drawn about the credibility of the individual's statements."); see also 20 C.F.R. 404.1513(d)["[W]e may also use evidence from other sources [which includes parents and other relatives] to show the severity of your impairment(s) and how it affects your ability to work."].

As noted above, Dr. Kelly opined that Plaintiff had seizures three to four times a week, while at the hearing before the ALJ, Plaintiff testified at one point that she had seizures three or four times a month, but also stated that her seizures would cause her to miss about four days a week because she had seizures about three times a week. (R.pp. 113, 115, 117). To bolster this evidence,

16



Plaintiff submitted lay witness statements to the Appeals Council, as follows: Eula Mae Brown (Plaintiff's aunt) stated that Plaintiff was sickly and had seizures "all the time," could not drive and could not travel by herself, had to have someone with her at all times, and was weak and "out of it." (R.pp. 357-360). Ms. Eartha Gant (Plaintiff's mother) stated that Plaintiff's seizures started off by Plaintiff "staring in space"; she would try to talk to Plaintiff but Plaintiff would mumble"; that after a few years Plaintiff's seizures got worse; that Plaintiff had episodes during which she fell out of bed and started trembling; and that Plaintiff had headaches that caused seizures. (R.pp. 361-365). Ms. Victoria Gant (Plaintiff's aunt) stated that Plaintiff had been a sickly person since birth, had problems with her seizures, that she had found Plaintiff on the floor "spaced out," and that Plaintiff's seizures were getting worse such that Plaintiff was having them three to four times a month. (R.pp. 366-369). Mr. Bryan King (a pharmacist who was Plaintiff's supervisor and worked with her from Fall 2008 to December 2011) stated that she had at least two seizure episodes in which she passed out without any prior warning, was unresponsive, and required immediate medical care and hospitalization; that there were other instances throughout the years where Plaintiff could not work either because she was too weak (possibly from the side effects of her seizure medications) or had had a seizure the previous night; and that in his opinion Plaintiff could not perform the tasks necessary to function in the workplace due to the severity of her medical condition. (R.pp. 370-371).

        In determining a claimant's residual functional capacity, "the ALJ must consider the relevant medical evidence and other evidence of the claimant's condition in the record, including testimony from the claimant and family members." Morgan v. Barnhart, 142 F. App'x. 716, 720 (4th Cir. 2005)(citing 20 C.F.R. § 404.1529(c)(3))). Further, if a lay witness provides information in addition to the claimant's testimony, the ALJ is required to weigh the lay testimony and articulate

17



reasons for rejecting or accepting it. Id., see also SSR 06–03p ["In considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence."]. Here, since the Appeals Council granted the request for review, it was required to follow the same rules for considering this evidence as ALJs are required to follow, make findings of fact, and explain its reasoning. Meyer, 662 F.3d at 705-706. Again, the Appeals Council failed to do so.

Finally, it is unclear what effect the additional evidence had on the Appeals Council's finding at step five (that Plaintiff could perform the unskilled jobs of janitor, laundry operator, and egg packer based on the VE's testimony at the hearing before the ALJ). At the hearing, the VE testified that the customary tolerances for absences in the work industry was "[n]o more than 2 days a month." (R.p. 120). Thus, if the additional evidence and lay witness testimony supports a finding that Plaintiff would miss more than two days a month, the VE's testimony would not support the Appeals Council's step 5 finding. The Appeals Council did not explain or discuss its apparent rationale for finding that Plaintiff's impairments would not cause her to miss more than two days a month in light of the additional evidence and the record as a whole.

Therefore, this action should be remanded to the Commissioner for further consideration of the opinion of treating neurologist Dr. Kelly, as well as the new medical records and lay testimony admitted to the record by the Appeals Council. See Meyer v. Astrue, 662 F.3d 700 at 706. With respect to the remainder of Plaintiff's claims of error, the ALJ will be able to reconsider and re-evaluate the evidence in toto as part of the reconsideration of this claim. Hancock v. Barnhart,



18

206 F.Supp.2d 757, 763-764 (W.D.Va. 2002)[On remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted *de novo*].

## Conclusion

Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence Four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for reevaluation of the evidence as set forth hereinabove, and for such further administrative action as may be necessary.  See Shalala v. Schaefer, 509 U.S. 292 (1993).

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

December 3, 2015
Charleston, South Carolina



19

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).



20